John Du Wors, State Bar No. 233913
john@newmanlaw.com
NEWMAN DU WORS LLP
2101 Fourth Avenue, Suite 1500
Seattle, WA 98121
Telephone:  (206) 274-2800
Facsimile:   (206) 274-2801

Leeor Neta, State Bar No. 233454
leeor@newmanlaw.com
NEWMAN DU WORS LLP
1900 Powell Street, Sixth Floor
Emeryville, CA 94608
Telephone:  (415) 944-5422
Facsimile:   (415) 944-5423

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NEW SHOW STUDIOS, LLC, a Nevada limited liability company, ANTHONY VALKANAS, an individual, DAVISON DESIGN & DEVELOPMENT, INC., a Pennsylvania corporation,<br><br>Plaintiffs,<br><br>v.<br><br>JIMM NEEDLE, an individual, GREG HOWE, an individual, DOES 1-20, inclusive,<br><br>Defendants | No. 14-cv-01250-CAS (MRWx)<br><br>**THIRD AMENDED COMPLAINT FOR**<br><br>1. **False Light Invasion of Privacy**<br>2. **Trade Secret Misappropriation**<br>3. **Defamation Per Se**<br>4. **Copyright Infringement – 17 U.S.C. §§ 101** *et seq.*<br>5. **Trademark Infringement – 15 U.S.C. §§ 1125(a)** *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs New Show Studios, LLC ("New Show"), Anthony Valkanas ("Valkanas") and Davison Design & Development, Inc. ("Davison Design") allege as follows, upon actual knowledge with respect to themselves and their own acts, and upon information and belief as to all other matters:

## I. JURISDICTION AND VENUE

1. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367. Defendants are alleged to have violated federal law—including the federal Copyright and Trademark Acts—and to have engaged in false advertising, copyright infringement and trademark infringement all in violation of federal law. The Court has supplemental jurisdiction over the remaining claims which are related.

2. Venue is proper under 28 U.S.C. § 1391(b). Defendants are accused of illegally diverting New Show's clients to one of its competitors, the Television Writers Vault ("TWV"). TWV is located in this district. As such, a substantial part of the events or omissions giving rise to Plaintiffs' claim occurred in this district.

## II. BACKGROUND FACTS

**A. New Show packages and markets movies and TV shows for aspiring writers and producers.**

3. Plaintiff New Show Studios, LLC is a company designed specifically for everyday people with ideas for screens big and small, including TV shows and movies. Plaintiff Anthony Valkanas has been employed by New Show since its inception and currently serves as its President. New Show works with people who lack entertainment industry connections by taking their entertainment ideas or concepts, packaging them, refining them and presenting them to entertainment companies.

4. New Show has thousands of clients and prospective clients in the United States. New Show has received numerous testimonials from satisfied clients

who are happy with the work New Show has done on their behalf.

**B.     New Show fully discloses what it does for clients and what it charges.**

5.     New Show discloses what it does and what it charges for its services on its website, in its promotional materials, and in its employees' conversations with potential clients. New Show's description of services and charges isn't buried in its terms of service or couched in legalese: it is written in plain English, and prominently featured on New Show's website:

> **Important Information**
>
> <u>**You should read all of this information before proceeding.**</u>
> [New Show] does not perform or offer profit or revenue evaluations for show idea submissions. We do not perform or offer evaluations or projections of commercial potential or the likelihood of successful development. Discussing your idea with you or offering services to you does not mean that [New Show] believes that your idea has merit or potential for successful development.
>
> We ask that all submitters be realistic. New entertainment development is high risk and there is very little likelihood that your idea will be successfully licensed or result in profit to you.
>
> It is New Show's normal practice to seek more than one contract in connection with a submitted idea. Those contracts are:
>
> Pre Development Agreement - [New Show] will: (a) provide information on entertainment subjects that are relevant to the development and production of your show idea; and (b) attempt to present your idea to a licensee after a concept package is fully developed. [New Show] charges a fee of four hundred and ninety five dollars ($495), plus a ten percent commission of all money received by the client on the sale or license of the entertainment product.
>
> New Production Sample Agreement - [New Show] offers to professionally design and develop a show concept package with DVD, brochure and packaging. While the fees for these services are individually quoted based upon the anticipated work to create the

> show concept package for the particular show idea, the fees typically range from eight thousand to twelve thousand dollars ($8,000-12,000).

New Show requires that potential clients review and check a box indicating that they have read and understood this information before proceeding. These core principles—that entertainment development is high risk, and that New Show charges the fair rates described above for each step of the development process—are repeated by New Show employees when interacting with customers.

6. New Show employs account executives who interact directly with New Show's customers and potential customers. Account executives are trained to fully disclose New Show's fee structure and to not promise any particular result—because selling a show idea is dependent on producers' interest in the idea, which New Show does not and cannot control. Valkanas closely supervises New Show's account executives to ensure that they accurately and truthfully relay New Show's services to New Show's clients and prospective clients.

7. New Show created a state of the art production facility to produce professional, high quality show concept packages to present to entertainment producers. Entertainment producers prefer to receive a "Show Concept Video" which is a 2-3 minute video pitch that describes and demonstrates the show idea. New Show knows that producing a full demo reel—a full-length sample episode—is ineffective because entertainment producers won't usually take the time to review it. New Show also knows that presenting an idea verbally or on paper without a video concept reel is usually ineffective because producers rarely take a raw idea seriously without some illustration of how it would look and feel as a video production.

8. Once a presentation package is complete, New Show sends it to SFM Entertainment to market. SFM Entertainment is New Show's exclusive licensing agent. This relationship is disclosed on New Show's website, and New Show's

account executives describe that relationship to New Show's clients and prospective clients.

9. SFM Entertainment has over 40 years of experience in the entertainment industry, giving New Show the industry expertise needed to get show ideas in front of entertainment producers. SFM uses a variety of means to market a show idea. Sometimes, SFM knows that a particular producer might be interested in the subject matter of a particular new show idea and will send the idea and promotional package to the producer directly. Other times, SFM will call a variety of producers to see if anyone is interested, or will approach producers at trade shows or other industry events and describe a show idea. Further, SFM knows from experience which producers are most likely to be receptive to particular new show ideas—knowing who to approach and how to approach them is a key part of the value SFM provides to New Show's clients.

10. SFM and New Show communicate regularly regarding SFM's efforts to market each show idea. SFM aggressively markets New Show's clients' ideas and New Show trusts SFM's diligence and ability. But, New Show still ensures that each client's idea is receiving appropriate attention, and asks for regular progress reports and for SFM to describe what marketing attempts will be made for each idea.

C. **Defendant Howe is a disgruntled former client who wanted New Show to pay all expenses for producing his television pilot and then began harassing New Show after New Show refused.**

11. Defendant Greg Howe is a former client of New Show. Howe engaged New Show's services and signed a Pre Development Agreement with New Show. He initialed that he had read and understood the information about New Show's services. New Show fulfilled its responsibilities under the Pre-Development Agreement and provided information on entertainment subjects that were relevant to the development and production of Howe's show idea, the "Charity Challenge". New Show also attempted to present Howe's idea to a licensee. New

Show told Howe that in order to effectively present a new show idea, Howe (and every New Show inventor) should have a Show Concept Video. Howe failed to either provide his own reel or pay for New Show to produce one.

12. In its conversations with clients like Howe, New Show never shares its personal opinion of a show idea's worth. New Show does not want its customers proceeding on opinion rather than fact. New Show never promises to produce a "pilot reel" for the initial payment of $495. New Show does not produce "pilot reels". Instead, New Show produces Show Concept Videos, and charges between $8,000-12,000 to do so. Howe never sent a reel for New Show to review.

13. New Show never told Howe that he was required to pay $80,000 to reacquire the rights to his show idea. New Show does not take rights; New Show requires that clients assign 10% of royalties to New Show, but each New Show client is free to promote their own projects in addition to New Show's efforts and continues to hold the rights to the client's idea.

14. Howe repeatedly wanted to talk with New Show about which "starlets" should be cast in Howe's show, the "Charity Challenge". Howe claimed that he had an inside track to the "next prime minister of Canada" and wanted to ask that person to be on his show. New Show repeatedly told Howe that he was "putting the cart before the horse" and that they should be focusing on getting a producer.

15. On October 8, 2013, New Show spoke a final time with Howe. Howe demanded that New Show produce what Howe called a "demo reel" for free. New Show told Howe that he was repeatedly informed that New Show would not do so and that Howe reviewed disclosures and signed an agreement indicating that he would need to create or pay New Show to create a Show Content Video in order to effectively market Howe's idea. New Show repeated that it could produce the Show Concept Video for between $8,000-12,000.00.

16. Thereafter, Howe assumed an inexplicably aggressive and vindictive posture towards New Show. In late 2013, New Show began receiving hostile emails

from Howe. New Show also received emails between Howe and New Show's current and prospective clients. New Show also discovered that Howe was posting defamatory statements on Internet bulletin boards and other Internet locations, including communicating directly to current and prospective New Show clients.

**D. Defendant Needle is a former employee who stole private information about New Show's clients and New Show's copyrighted materials for Needle's competing business and/or TWV.**

17. Defendant Needle was employed by Plaintiff Davison Design from November 7, 2011 until December 20, 2012. On that date, he transferred to New Show's sister company, George Davison Studios, LLC, where he worked as a creative producer until April 18, 2013.

18. Before he left his employment with George Davison Studios, Needle stole and posted to his personal website several visual works (the "DARE TO INVENT Videos") belonging to Davison Design. Needle employs this website to promote his own competing video production services. Although he was involved in the production of the DARE TO INVENT Videos, Needle's involvement was undertaken pursuant to a written work-for-hire agreement. That agreement makes clear that a sister company to Davison Design owns the DARE TO INVENT Videos.

19. Howe and Needle met online, and began working together to discredit New Show's operations. Howe speaks repeatedly of his "insider guy" in communications with New Show's clients and potential clients. In one telling email, he reveals who the "insider guy" is: he tells client Christian Yancey that "I know Jim Needle called you about our case[.]" Needle provided Howe with inside information, including names for New Show clients.

20. Defendants then contacted New Show's clients, encouraged New Show's clients to violate the terms of their contracts with New Show, and diverted the clients' business to one of New Show's primary competitors, TWV, and/or

Needle's own competing business. Needle communicated directly with some former clients.

### E. Valkanas was never investigated for homicide.

21. In his communications with New Show's clients, Howe claimed that Valkanas was investigated for "murder" and committed a "double homicide." This claim is not true. Years ago, Valkanas was present in a ski-resort condominium when a fire broke out in the condominium above him. He awoke the other persons staying in the condominium and exited to safety. Two other persons were caught in the fire and perished. Family members of the deceased sued the building owners, the persons in the condominium above, the builder, Valkanas, and others. Valkanas was never investigated for murder or homicide by anyone, and the negligence lawsuit against him was eventually dismissed.

### F. New Show lost both current and prospective customers.

22. New Show suffered harm from Defendants' actions by losing current and prospective customers. Some current customers stopped working with New Show midway through pre-development agreements. Others expressed interest in New Show, but then never paid for New Show's services after receiving information from Defendants. Others completed a pre-development agreement, but did not order a Show Concept Video after Defendants contacted the clients or posted information on the Internet defaming New Show. New Show has been harmed by losing revenue and through harm to New Show's reputation. New Show has also been harmed by having to dedicate resources to responding to Defendants' false statements.

## III.   FIRST CAUSE OF ACTION
## FALSE LIGHT INVASION OF PRIVACY
### (Against Howe)

23. Plaintiffs re-allege and incorporate by reference, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this

Complaint.

24. A person can sue for false light when something highly offensive is implied to be true about them that is actually false.

25. In order for a non-public figure to prove a false light claim, a plaintiff must show that (1) the defendant implied something false; (2) the false impression is highly offensive to a reasonable person; (3) the falsehood in question sufficiently identifies the plaintiff; (4) the defendant publicly disclosed the falsehood, and (5) the defendant acted negligently.

26. Howe placed Valkanas in a false light by implying that he had committed a double homicide.

27. Howe's implication that Valkanas committed a double homicide is highly offensive to a reasonable person.

28. Howe publicly disclosed his statements about Howe.

29. Howe acted negligently.

30. As a direct result, Plaintiffs have been injured in an amount that has not yet been determined, but which will be proven at trial.

## IV. SECOND CAUSE OF ACTION
## TRADE SECRET MISAPPROPRIATION
### (Against All Defendants)

31. Plaintiffs re-allege and incorporate by reference, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this Complaint.

32. Plaintiffs maintain one or more secure computer servers for hosting their client data and other proprietary information. These servers contain private and sensitive information regarding thousands of clients as well as confidential information concerning Plaintiffs' pricing and marketing strategies, client contacts and preferences, and other trade secret information.

33. Needle was aware of the confidential and sensitive information,

including the private client data, and was aware that it constituted confidential, proprietary trade secret information.

34. Needle intentionally and unlawfully gained access to confidential and sensitive information stored on Plaintiffs' private computer network. Without authorization or permission, Defendants thereby misappropriated Plaintiffs' confidential, proprietary competitor information, including information regarding Plaintiffs' clients and their business plans, pricing, marketing strategies, client contacts, and other competitive information constituting Plaintiffs' trade secrets.

35. This secret information had significant actual and potential economic value to Plaintiffs due but not limited to the fact that the information was not generally known to others. Plaintiffs took reasonable efforts to maintain the confidentiality of their trade secrets and proprietary information, including but not limited to maintaining the secrecy of their pricing and marketing strategies, business plans, client lists and contact information, by using computer passwords to limit access, and by securing confidentiality and non-disclosure agreements with each other and third parties.

36. Needle undertook these actions to obtain Plaintiffs' trade secrets for the benefit of Defendants and TWV, and to the detriment of Plaintiffs.

37. Needle undertook these activities personally, under the direction of Howe, and with his knowledge, approval and/or ratification.

38. As a result of Defendants' misappropriation, Plaintiffs have been irreparably injured, and have lost certain valuable competitive advantages. Plaintiffs have been injured in an amount that has not yet been determined, but will be proven at trial. Plaintiffs seek as damages to recover their own lost profits and/or a reasonable royalty. Plaintiffs also seek punitive damages against both Defendants based on their repeated willful and malicious acts.

|   |   |
|---|---|
| 1 | **V.　THIRD CAUSE OF ACTION** |
| 2 | **DEFAMATION PER SE** |
| 3 | **(Against Howe)** |

39.　Plaintiffs re-allege and incorporate by reference, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this Complaint.

40.　Howe published to Plaintiffs' clients, in writing and orally, false and defamatory statements regarding Plaintiff Anthony Valkanas, whom he falsely accused of committing a double homicide.

41.　Howe knew or should have known that such statements were false at the time they were made.

42.　Howe's defamatory statements to Plaintiffs' clients directly injured and continue to injure perceptions regarding Valkanas' moral character.

43.　Howe's defamatory statements constitute Defamation Per Se because the statements tended to directly injure Valkanas' personal reputation and Plaintiffs' reputation because Valkanas is Plaintiffs' president, and caused, by natural consequence, actual damage.

**VI.　FOURTH CAUSE OF ACTION**

**COPYRIGHT INFRINGEMENT –**

**17 U.S.C. §§ 501 *et seq.***

**(Against Needle)**

44.　Plaintiffs re-allege and incorporate by reference, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this Complaint.

45.　Davison Design is the true owner of copyrights in the DARE TO INVENT Videos.

46.　Needle has reproduced, distributed, and/or prepared one or more copies or derivative works of the DARE TO INVENT Videos without Davison

1  Design's consent.

2      47. Needle copied original material protected by copyright from Davison
3  Design.

4      48. Needle's acts are an infringement of Davison Design's rights in the
5  copyrights of the DARE TO INVENT Videos.

6      49. As a direct and proximate cause of Needle's infringement of Davison
7  Design's copyrights, Davison Design has been damaged by, and Needle has
8  profited from his wrongful conduct.

## VII. FIFTH CAUSE OF ACTION
## TRADEMARK INFRINGEMENT –
## 15 U.S.C. §§ 1125(a) *et seq.*
## (Against Needle)

13      50. Plaintiffs re-allege and incorporate by reference, as if fully alleged
14  herein, each of the allegations contained in the preceding paragraphs of this
15  Complaint.

16      51. Davison Design is the owner of the DARE TO INVENT mark.

17      52. Davison Design has used the DARE TO INVENT mark in commerce
18  continuously since April 7, 2011 to identify its services and to distinguish them
19  from those made and sold by others. Davison Design has prominently displayed its
20  mark on its website, and in related marketing and advertising.

21      53. The DARE TO INVENT mark is inherently distinctive or has acquired
22  distinctiveness.

23      54. Needle has infringed the DARE TO INVENT mark by using it in
24  connection with the promotion of his services in commerce.

25      55. Davison Design does not consent to Needle using, and never gave
26  permission or authorization to Needle to use, the DARE TO INVENT mark or any
27  confusingly similar name.

28      56. Needle's use of the DARE TO INVENT Videos is in a manner that is

likely to cause confusion, or to cause mistake, or to deceive as to an association, affiliation, sponsorship, or endorsement of his goods and services with or by Davison Design, without the permission or authorization of Davison Design.

57. Needle's current and continued use of the term DARE TO INVENT as described above is likely to cause confusion, to cause mistake, or to deceive the purchasing public.

58. Needle's infringing acts are intentional and willful. Needle has been on notice of Davison Design's DARE TO INVENT mark by virtue of its long-standing use of the mark.

59. Despite actual notice of his infringement, Needle refused to cease the infringing activity.

60. As a proximate result of Needle's conduct, Davion Design has suffered, and unless Needle is enjoined will continue to suffer, damage to its reputation and goodwill, injury to its current and potential customer base, and damages in an amount to be determined at trial.

61. Needle's conduct has irreparably harmed and, if not enjoined, will continue to irreparably harm the general public who has an inherent interest in being free from confusion, mistake, and deception

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment against Defendants as follows:

1. Under the First Claim for **False Light Invasion of Privacy**, against Howe:
   a. Temporary, preliminary and permanent injunctive relief;
   b. General damages to be proved at trial;
   c. Special damages to be proved at trial;
   d. Pre- and post-judgment interest thereon;
   e. Exemplary or punitive damages; and
   f. Such other and further relief as the Court deems just and proper.

  2. Under the Second Claim for **Trade Secret Misappropriation**, against all Defendants:
    a. Temporary, preliminary and permanent injunctive relief;
    b. General damages to be proved at trial;
    c. Special damages to be proved at trial;
    d. Pre- and post-judgment interest thereon;
    e. Exemplary or punitive damages;
    f. Attorneys' fees and associated costs of suit; and
    g. Such other and further relief as the Court deems just and proper.
  3. Under the Third Claim for **Defamation Per Se**, against all Defendants:
    a. Temporary, preliminary and permanent injunctive relief;
    b. General damages to be proved at trial;
    c. Special damages to be proved at trial;
    d. Pre- and post-judgment interest thereon;
    e. Exemplary or punitive damages; and
    f. Such other and further relief as the Court deems just and proper.
  4. Under the Fourth Claim for **Copyright Infringement**, against Defendant Needle:
    a. Temporary, preliminary and permanent injunctive relief;
    b. General damages to be proved at trial;
    c. Special damages to be proved at trial;
    d. Pre- and post-judgment interest thereon;
    e. Exemplary or punitive damages;
    f. Attorneys' fees and associated costs of suit; and
    g. Such other and further relief as the Court deems just and proper.
  5. Under the Fifth Claim for **Federal Trademark Infringement**, against Defendant Needle:
    a. Temporary, preliminary and permanent injunctive relief;

      b. General damages to be proved at trial;

      c. Special damages to be proved at trial;

      d. Pre- and post-judgment interest thereon;

      e. Exemplary or punitive damages;

      f. Attorneys' fees and associated costs of suit; and

      g. Such other and further relief as the Court deems just and proper.

Respectfully submitted February 16, 2015.

**NEWMAN DU WORS LLP**

_____
Leeor Neta, State Bar No. 233454
John Du Wors, State Bar No. 233913
Attorneys for Plaintiffs
New Show Studios, LLC; Anthony Valkanas, and Davison Design & Development, Inc.

## IX.  DEMAND

Plaintiffs demand a jury trial on its Complaint.

Respectfully submitted February 16, 2015.

**NEWMAN DU WORS LLP**

_____
Leeor Neta, State Bar No. 233454
John Du Wors, State Bar No. 233913
Attorneys for Plaintiffs
New Show Studios, LLC; Anthony Valkanas, and Davison Design & Development, Inc.